UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

    vs.

THE ADVISORY BOARD COMPANY,
ROBERT W. MUSSLEWHITE, and
MICHAEL T. KIRSHBAUM,

                        Defendants.

—————————————————— x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Monroe County Employees' Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of The Advisory Board Company's ("Advisory Board" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a securities class action on behalf of all purchasers of the common stock of Advisory Board between January 21, 2015 and February 23, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.       The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and SEC Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act [15 U.S.C. §78aa].

4.       Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District. Advisory Board common stock is listed on the NASDAQ Global Select Market ("NASDAQ"), which is located in this District. The false and misleading statements were

disseminated in this District, and therefore the manipulative conduct was carried out in part in this District.

5.      In connection with the acts alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ, a national securities exchange.

## PARTIES

6.      Plaintiff Monroe County Employees' Retirement System purchased Advisory Board common stock as set forth in the certification attached hereto and incorporated herein by reference and was damaged thereby.

7.      Defendant Advisory Board is a publicly traded consulting company that provides performance-improvement software and solutions to the healthcare and education industries.  The Company's stock is listed and trades on the NASDAQ under the ticker symbol "ABCO."  As of May 1, 2017, the Company had more than 40.5 million shares of common stock outstanding.

8.      Defendant Robert W. Musslewhite ("Musslewhite") is, and was throughout the Class Period, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Advisory Board.

9.      Defendant Michael T. Kirshbaum ("Kirshbaum") is, and was throughout the Class Period, Chief Financial Officer ("CFO") and Treasurer of Advisory Board.

10.      Musslewhite and Kirshbaum are sometimes referred to herein, collectively, as the "Individual Defendants."  The Individual Defendants, together with Advisory Board, are sometimes referred to herein, collectively, as "Defendants."

11.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational

trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

12.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any

previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Advisory Board's business prospects and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

15.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action on behalf of all persons who purchased Advisory Board common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Advisory Board or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Exchange Act;

(b)     whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about the business and operations of Advisory Board;

(c)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d)     whether the price of Advisory Board common stock was artificially inflated; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

22.     Advisory Board is a provider of software and solutions to the higher education and healthcare industries.  The Company's higher education programs support colleges and universities in enrollment management; academic programming and student learning; faculty recruitment and retention; student advising and success; alumni affairs and advancement, and college and university operations.  The Company offers distinct membership programs across four areas, which include best-practices research and insight, performance technology software, consulting and management services, and data- and tech-enabled services.

23.     On December 10, 2014, Advisory Board announced that it had signed a definitive agreement to acquire Royall & Company ("Royall"), described as the higher-education leader in strategic, data-driven student engagement and enrollment management solutions, financial aid optimization, and alumni fundraising.  The Company further described Royall's services as helping

non-profit colleges and universities achieve such critical institutional goals as strengthening national reputations, broadening student enrollment, improving overall academic profiles, and enhancing revenue.  Under the terms of the agreement, Advisory Board agreed to purchase Royall for $850 million, consisting of $750 million in cash and approximately $100 million in Advisory Board stock.

24.    On January 9, 2015, Advisory Board completed the acquisition of Royall.  The purchase price for the acquisition, before taking into account specified adjustments, was approximately $871 million, consisting of $750 million in cash and 2,428,364 shares of Advisory Board common stock, valued at approximately $121 million based on Advisory Board's closing stock price of $49.92 per share on January 9, 2015.  Advisory Board funded the cash portion of the purchase price and the costs and expenses related to the acquisition with cash on hand and the proceeds from its new $775 million senior secured credit facilities, consisting of a $725 million senior secured term loan facility and a $50 million undrawn revolving credit facility.  An entity called Royall Holdings, LLC ("Royall Holdings") survived the transaction and owned the Advisory Board common stock paid to Royall.

25.    Advisory Board allocated more than 78% of the Royall purchase, or approximately $664 million, to goodwill.

**DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT**

26.    At the time the acquisition was first announced in December 2014, Advisory Board projected that Royall would produce between $121 million and $124 million in revenue, representing between 15% and 18% growth from 2014 levels.  Revenue guidance was raised to a new level of approximately $125 million to $130 million after the deal closed and management provided official 2015 guidance.

27.    On or about January 20, 2015, Advisory Board filed a registration statement and prospectus with the SEC through which: (1) Advisory Board offered to sell 3,650,000 shares of its common stock on its own behalf; and (2) Royall Holdings offered to sell 1,050,000 shares of the Advisory Board common stock it acquired less than two weeks earlier.  The registration statement appended Royall's audited consolidated financial statements for the years ended June 30, 2014, 2013, and 2012, as well as the unaudited consolidated financial statements as of September 30, 2014.

28.    However, unbeknownst to investors, Advisory Board's depiction of Royall's reported revenue for prior years was materially misleading because, as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board, and with its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board.

29.    During the remainder of the Class Period, Defendants concealed the existence of integration problems in connection with the Royall acquisition despite a duty to disclose them.  For example, during a May 5, 2015 earnings conference call, Defendant Musslewhite, the Company's CEO and Chairman, made positive statements about the Royall integration, including a statement that it is "moving more quickly than we had planned."  However, Musslewhite failed to disclose that the CEO and CFO of Royall, who remained employed by Advisory Board after the acquisition to help facilitate the integration, had already – and unexpectedly – left Advisory Board prior to that call.

30.    On August 4, 2015, Defendants disclosed that the surprising departure of Royall's CEO and CFO, along with Advisory Board's inability to recognize revenue on certain contracts due to the earlier deadline to close Royall's books, led to disappointing financial results from Royall.

Nevertheless, Defendants continued to falsely claim during the Class Period that, "from an integration and operational standpoint, we are making good progress" concerning Royall.

31.     Then, on February 23, 2016, Advisory Board finally disclosed the extent of the problems with Royall.  On that date, the Company announced a net loss of **$101.8 million** for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014.  According to the Company, the increase in net loss was primarily attributable to an impairment charge of $95.7 million (subsequently increased to $99.1 million) to Royall's goodwill, due to Royall's "first year performance being below the expectations we had set as of the acquisition date."  Indeed, Royall produced only $118 million in revenue in 2015, compared to Defendants' guidance of $125 million to $130 million.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

32.     On January 20, 2015, after the market closed, Advisory Board filed with the SEC a shelf registration statement on Form S-3ASR (File No. 333-201608).

33.     On the same day, Advisory Board filed a preliminary prospectus supplement to the registration statement, pursuant to which Advisory Board offered 3,275,000 shares of its common stock and Royall offered 1,425,000 shares of Advisory Board common stock.

34.     On or about January 22, 2015, Advisory Board filed with the SEC a final prospectus supplement to the prospectus filed on January 20, 2015.  Pursuant to the final prospectus supplement, Advisory Board offered 3,650,000 shares of its common stock, Royall offered 1,050,000 shares of Advisory Board common stock, and the underwriters of the offering were granted an option to purchase up to an additional 705,000 shares of common stock from Royall Holdings.  On January 21, 2015, the last reported sale price of Advisory Board's common stock was $44.33 per share.

35.    The registration statement and prospectus supplements (collectively, the "Registration Statement") contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading.

36.    Specifically, the Registration Statement stated that Advisory Board preliminarily allocated approximately $659 million of the Royall transaction to goodwill.  In addition, the Registration Statement reported Royall's Consolidated Statements of Comprehensive Income for the years ended June 30, 2012, 2013, and 2014, stating, in pertinent part, as follows:

**Royall Acquisition Co. and Subsidiaries**
**Consolidated Statements of Comprehensive Income**
**Years Ended June 30, 2012, 2013 and 2014**

| | Predecessor | Successor | | |
| --- | --- | --- | --- | --- |
| | Period Ended December 22, 2011 | Period Ended June 30, 2012 | Year Ended June 30, 2013 | Year Ended June 30, 2014 |
| Revenue | $   32,720,889 | $ 45,768,178 | $ 88,615,775 | $104,632,341 |
| Postage expenses | (3,128,382) | (3,418,611) | (6,831,872) | (8,090,529) |
| Printing, mailshop, data processing and other production expenses | (4,823,941) | (5,189,374) | (10,973,401) | (11,744,601) |
| Personnel and benefits expenses | (12,103,062) | (14,003,813) | (28,767,284) | (31,611,705) |
| Occupancy expenses | (588,725) | (639,669) | (1,531,713) | (1,755,535) |
| Depreciation and amortization expense | (2,014,348) | (3,476,702) | (6,943,079) | (7,339,171) |
| Travel and workshop expenses | (628,930) | (910,689) | (1,647,939) | (1,822,465) |
| Selling, general and administrative expenses | (1,129,146) | (1,702,729) | (4,610,394) | (4,023,356) |
| Operating income | 8,304,355 | 16,426,591 | 27,310,093 | 38,244,979 |
| Other expenses | | | | |
| Interest expense | (2,995,625) | (8,835,870) | (16,004,414) | (15,769,395) |
| Transaction expenses | (1,159,661) | (5,996,466) | — | — |
| Amortization of deferred financing costs | (330,382) | (604,706) | (1,267,973) | (5,351,157) |
| Other loss | (857) | (349) | (20,508) | (51,675) |
| Net income before income taxes | 3,817,830 | 989,200 | 10,017,198 | 17,072,752 |

| | | | |
|---|---|---|---|
| Income tax expense | (1,570,395) | (2,678,238) | (3,848,057) | (6,669,394) |
| Net income (loss) | $ 2,247,435 | $ (1,689,038) | $ 6,169,141 | $ 10,403,358 |
| Total comprehensive income (loss) | $ 2,247,435 | $ (1,689,038) | $ 6,169,141 | $ 10,403,358 |

37.     The statements referenced above in ¶36 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)     that Advisory Board's depiction of Royall's reported revenue for prior years was materially misleading because the Registration Statement failed to disclose that, as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board. With its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board; and

(b)     that the amount of goodwill that Advisory Board allocated to Royall was lacking in a reasonable basis.

38.     The offering was successful for the Company and Royall Holdings. On January 21, 2015, 3,650,000 shares of Advisory Board common stock were sold to the public by the Company, and 1,755,000 shares of Advisory Board common stock were sold by Royall Holdings. The shares were sold at a price to the public of $43.00 per share, less an underwriting discount of $1.935 per share, for a net per share purchase price of $41.065. After deducting the underwriting discount and selling costs, the net proceeds received by the Company were approximately $148.8 million.

39.     On February 11, 2015, Advisory Board issued a press release announcing its financial results for the quarter and nine-month period ended December 31, 2014.[1] The Company provided

---

[1]     On November 6, 2014, Advisory Board announced a change to its financial reporting periods to make its fiscal year consistent with the calendar year. Historically, the Company's fiscal year-end had been March 31. With this announcement, the Company changed its fiscal year to December 31 beginning with the-then current transition period ending December 31, 2014.

updated revenue guidance for calendar year 2015 of $780 million to $800 million, equating to approximately $125 million to $130 million of Royall revenue. The Company had previously announced revenue guidance for Royall of $121 million to $124 million in December 2014.

40.    On the same day, Defendants conducted a conference call with investors and analysts during which they made positive statements about the Royall acquisition and Royall's integration into the Company. During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> *Finally, in terms of culture, fit and integration, everything is going very well.* John Nester, Royal & Company's CEO, has been great to work with and his team is strong. Obviously, we're only a few weeks in here, but there is a lot of positive momentum on both sides and *we are confident that this combination is going to yield great success.*

41.    The statements referenced above in ¶¶39-40 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)    that as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board. With its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board;

(b)    that there were severe integration problems associated with Advisory Board's acquisition of Royall; and

(c)    as a result of the integration problems associated with the Royall acquisition, Defendants had no basis to increase the revenue guidance for Royall.

42.    On May 5, 2015, the Company issued a press release announcing its financial results for the quarter ended March 31, 2015. In the press release, the Company reaffirmed its financial guidance for adjusted revenue for calendar year 2015 to be in a range of $780 million to $800 million.

- 12 -

43.     On the same day, Defendants conducted a conference call with investors and analysts during which they made positive statements about the Royall acquisition and Royall's integration into the Company.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> Royall & Company is obviously more recent than the other two [acquisitions], since the [Royall] acquisition only closed in January, and we always had a longer integration timeline planned when we acquired them, with the company running a little bit more independently initially.  ***The good news here is that integration is moving more quickly than we had planned, and we are having some key early wins around introducing Royall's world-class enrollment managed services to education advisory board members that have an acute need for enrollment services.***

> We expect to have more news as the year progresses, but early signs lead us to feel good about our future prospects for not only continued cross-selling of Royall solutions to [Education Advisory Board ("EAB")] members and EAB programs to Royall members, but also key feature focused activity, such as joint new product development to provide more and more value to the industry around the student success lifecycle and deepen our relationships across our joint member base of the early 1,000 institutions.

44.     During the conference call, Defendant Kirshbaum had the following exchange with an analyst regarding Royall:

> **Donald Hooker** - KeyBanc Capital Markets - Analyst

> Okay. I think in the previous quarter you mentioned that there might be some temporary margin pressures on Royall. I'm just trying to think about Royall's margins are obviously already very high and impressive. How, now that you're a little bit further along, obviously past the integration of Royall, how does that look for the rest of this calendar year and into 2016?

> **Michael Kirschbaum** - Advisory Board Company - CFO

> I think initially we said the first year there was obviously not a great deal of cost synergy.  ***Royall is a high-margin business.  I don't think we expect it to be anything other than that.  We expect it to maybe be able to maintain its margins***. But a lot of the synergies through revenue synergies would come in out years as we work together to pursue joint sales efforts, to penetrate cross-sell on both sides and develop new products off the platform.  That was our expectation.  ***We are pretty early, but those are proceeding as we would expect***.

- 13 -

45.     The statements referenced above in ¶¶42-44 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)     that as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board.  With its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board;

(b)     that there were severe integration problems associated with Advisory Board's acquisition of Royall;

(c)     that as a result of the integration problems associated with the Royall acquisition, Defendants had no basis to reaffirm the revenue guidance for Royall; and

(d)     that the CEO and CFO of Royall had already left Advisory Board.

46.     On August 4, 2015, the Company issued a press release announcing its financial results for the quarter ended June 30, 2015.  In the press release, the Company updated its financial guidance for adjusted revenue for calendar year 2015 to be in a range of $780 million to $790 million, revised from the previous range of $780 million to $800 million.

47.     On the same day, Defendants conducted a conference call with investors and analysts. During the call, for the first time, Defendants partially disclosed problems with Royall and its integration into Advisory Board, including the unanticipated departure of Royall's CEO and CFO during the previous quarter.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> ***The only exception to an otherwise strong start to the year is Royall, where we were disappointed to see slower growth out of the gates than we expected.***  Fortunately, given the acceleration of the rest of our business, we remain on track to deliver strong overall performance as a company this year, and set ourselves up for very good results in 2016 and beyond.  And we feel very good about the path forward

with Royall closely integrated into EAB and much more closely linked to our sales, renewals, and new product development teams and processes.

*       *       *

However, as I mentioned earlier, from a growth perspective Royall has not yet performed as we expected.  There are three main reasons for the slow start.

*First, the CEO and CFO chose to depart earlier than expected, impacting sales and up-sells during a critical time and distracting the organization.  Second, it is now clear that the time and attention the Royall team spent on the transaction and all the surrounding activity took focus away from key commercial activities, putting them too far behind to catch up in the June quarter.  Third, Royall as a private company closed its books each quarter later than we do as a public company.  We have moved Royall to our closed schedule and this timing change has some impact on when we were able to begin recognizing revenue for certain contracts, especially for the June quarter.*

*As a result of these issues, Royall revenue growth is pacing behind what we expected for the calendar year. In our judgment these are all one-time issues and very addressable, and while they are disappointing we do not expect them to persist.*  We now have allocated significant Advisory Board talent to work with the Royall team to improve execution, and we're already seeing substantial improvements.  Overall, the integration plan is proceeding ahead of pace.

48.      During the August 4, 2015 conference call, Defendant Kirshbaum also discussed the

Company's problems with Royall, stating, in pertinent part, as follows:

Before discussing guidance for the year, I wanted to follow up on Robert's comments on Royall & Company and discuss the changes from our original expectations.  *For the first six months of the year, Royall performance suffered for three main reasons.  Deal distraction, which took time away from business-generating activities, management turnover which created a loss of focus and disrupted certain sales pursuits, and some lost timing in the transition from private to public company close calendar.*

Historically, the January through June period is very busy for Royall as they help schools fill their classes before the May 1 deposit deadline.  In this period, Royall typically generates a lot of new business both from bringing on new schools that are behind on enrollment, and in addition, expanding work with existing schools who are looking to add students late in the cycle.

*This year the disruption caused by management turnover and deal distraction resulted in not capturing as many new clients or up-sell opportunities as the prior years. And therefore the revenue from these sources in the January through June period was lower than expected.*

- 15 -

Not only does missing on the new sales impact the January through June revenue, but in a renewal business this impact extends for the next 12 months as well. With fewer new clients and less client expansion to renew, accrual revenue coming from renewals in the second half of the year will be below expectations.

*We were also impacted by a timing issue as Royall's transition from a private to public company. As a private company, Royall could take longer to close their books than what we require of them to meet our public filing deadlines.*

*With books open longer, they had more time to get contracts back in from clients before closing their quarters, and by changing in close earlier there is some revenue that gets pushed into future quarters.* This is strictly a timing issue and it will cycle through within a year. We believe each of these incidents is isolated and solvable, and we're making very good progress in putting the right people and processes in place to reflect performance going forward.

49.    Despite these problems, during the call, Defendant Musslewhite said that the Company needed "to continue to execute on the integration plan," stating, in pertinent part, as follows:

As always, our depth of relationships and insight in healthcare and higher education gives us a tremendous advantage at understanding opportunities to serve members in new ways. And we continue to actively pursue new ideas that fit within our overall business formula. Whether through organic new launches or acquisitions, we continue to see exciting new areas for future growth and expansion that we will pursue.

And in this regard Royall is really important because it's a critical platform for future growth in our vision of how we can impact the industry. *Therefore we need to continue to execute on the integration plan.* This will improve operations which will flow through to financial results, and more importantly, advance the innovative ways we can link Royall to our other assets and help transform higher education.

50.    During the conference call, when asked when exactly did Royall's CEO and CFO leave Advisory Board, Musslewhite responded, "During the second quarter. Probably the middle of the second quarter, early on in the second quarter, *April, early May.*"

51.    During the same conference call, Musslewhite also discussed the impact on the Company of the departure of Royall's CEO and CFO. An analyst and Musslewhite stated, in pertinent part, as follows:

**Joseph Foresi** - Janney Montgomery Scott - Analyst

[A]nd so using that same methodology, Royall seems to have a compelling ROI. *Why would the defection of the CEO or CFO or any of the distractions that you mentioned* -- I guess I can understand closing of the books -- why would that *affect the subscription rate if the product was incredibly compelling?*

**Robert Musselwhite** - Advisory Board Company - CEO

It's -- *number one, those guys were the ones that had their hands very tightly controlled around if there was any sales management, it was through those guys in terms of sitting on top of the business and steering the bus, as you will. The CEO was also personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships. So it just disrupts.* When you are going towards a specific deadline of June 30 and for us the deadline is tighter because we close our books sooner than they typically did, and you have disruptions during that period, especially remember what Michael said, the deposit date of May 1 and forward is a really critical time for them to come back and demonstrate that value.

And you have a disruption to the process they followed, it just creates some looser execution than you want. It's not as if we don't have talented people in place and a great value proposition. We feel great about all that. It's just one of the reasons why we feel like this is one-time and very addressable.

52.    In response to this news, Advisory Board's common stock fell 21%, from $59.36 per share on August 4, 2015, to close at $46.99 per share the next day, on unusually high volume of approximately 2.5 million shares.

53.    Despite this news, the true facts about the Company remained concealed. The statements referenced above in ¶¶46-51 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)    that the amount of goodwill that Advisory Board allocated to Royall was artificially inflated; and

(b)    that severe integration problems associated with Advisory Board's acquisition of Royall continued to exist.

- 17 -

54. On November 5, 2015, the Company issued a press release announcing its financial results for the quarter ended September 30, 2015. In the press release, the Company reaffirmed the financial guidance for adjusted revenue for calendar year 2015, which it announced on August 4, 2015, to be in a range of $780 million to $790 million.

55. On the same day, Defendants conducted a conference call with investors and analysts. During the call, Defendant Musslewhite continued to positively describe the Company's integration efforts despite the problems it had been experiencing with Royall, stating, in pertinent part, as follows:

> *The good news is that from an integration and operational standpoint, we are making good progress there.*
>
> \*       \*       \*
>
> Last but not least, we are heavily focused on the organizational integration efforts. I have been tremendously impressed with the quality and dedication of the Royall team and their engagement and excitement about the linkage with EAB is palpable. *When I look at the degree of interaction between multiple, different functional teams and the amount of collaboration across commercial, delivery, technology and central functions like finance, HR and IT, it feels very much like Royall is just as much a part of the Company as any other division.*
>
> It is a huge testament to the Royall leadership team and all the hard work on both sides that relationships and organizational collaboration feel good at this point and my hope is that this strong operational alignment will lead to good Royall results across 2016. *Overall, we remain both on track to deliver our expectations for the year* and optimistic about the long-term potential about the about combination of Royall and The Advisory Board.

56. The statements referenced above in ¶¶54-55 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)     that severe integration problems associated with Advisory Board's acquisition of Royall continued to exist.

57.     On February 23, 2016, after the market closed, Advisory Board acknowledged larger problems concerning Royall than previously disclosed.  On that date, the Company issued a press release announcing a net loss of **$101.8 million** for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014.  According to the press release, the increase in net loss was primarily attributable to an impairment charge of $95.7 million in the quarter ending December 31, 2015.

58.     On the same day, Defendants conducted a conference call with investors and analysts. During the call, Kirshbaum disclosed that the $95.7 million impairment to goodwill was related to Royall, and noted that it was preliminary and could change slightly before the Company filed its Form 10-K.

59.     During the same call, Kirshbaum stated that, for 2015, Royall ended with only 5% revenue growth, which was significantly lower than the double-digit growth Defendants had previously guided, which was no lower than 15% and as high as 21%.  Kirshbaum also said that the Company only expected Royall to grow in the mid-single digits going forward.  Indeed, according to Kirshbaum, Royall produced only $118 million in revenue in 2015, compared to Defendants' guidance of $125 million to $130 million.

60.     In addition, Musslewhite acknowledged that Advisory Board was facing "a ton of complexity and change," which prevented the Company from making additional acquisitions. Musslewhite had the following exchange with an analyst during the conference call:

**Shlomo Rosenbaum** - Stifel Nicolaus - Analyst

Hey, Robert, I want to ask you with the reorg that's going on, the focus on Royall, the efforts that you're making in terms of re-engaging in certain areas or focus on sales.  I'm just trying to reconcile that with the ability to make acquisitions this year and whether it's just going to stretch the Company just too much, I mean, what are your thoughts on that?

**Robert Musslewhite** - The Advisory Board Company - CEO

- 19 -

Well, I actually think, I sort of think about it in the reverse, although your question on a global basis is right. *Can we do another acquisition and dump it into a place where there's a ton of complexity and change right now?  No, of course not.*

\*        \*        \*

There are certain places in the business where would I wouldn't want to make an acquisition today, just given some of the complexity, but the types of acquisitions we're looking at, I actually think we're very well set up to manage those effectively.

61.     Analysts reacted negatively to the news disclosed on February 23, 2016.  For example, in a report to investors the next day, an analyst from Cantor Fitzgerald wrote, in pertinent part, as follows:

> *The core business is no longer able to absorb slower than originally anticipated growth from the Royall acquisition. We are lowering our price target to $32 from $60.*

\*        \*        \*

> Advisory Board posted somewhat light results in 4Q:15, as *the integration of Royall is still a work in progress* and the demand front for healthcare faces uncertainties. . . . *The integration of Royall has not progressed as originally planned, and it may take some time before we see further synergies.*

\*        \*        \*

> **Royall Integration and Healthcare Demand Weigh on Results.** 4Q:15 adjusted revenue was $205.0, growth of 37.5% y/y, vs. our estimate of 40.3%, *with shortfall coming from muted growth at Royall* and lower-than-expected conversion rates in the Healthcare business.  In Healthcare, the revenue cycle business was most impacted by softer demand as the passing of the October 1st ICD-10 deadline led to a halt in sales of products related to preparation for the implementation of the regulation. *Originally, management had expected full-year contribution from Royall to be $125-130 million, but overall impact came in at $118 million.* We estimate organic growth was 8% y/y in the quarter.

\*        \*        \*

**Royall Experiencing Growing Pains**

**Royall Pains**

**Royall Performance**.   In January 2015, ABCO acquired Royall & Company ("Royall"), a provider of strategic, data-driven student engagement and enrollment management solutions for higher education institutions.  ABCO purchased Royall for

$850 million, consisting of $750 million in cash and $100 million in ABCO stock. The Royall purchase price was just above 8x Royall's FY:14 revenues, 18x FY:14 EBITDA, and 65x FY:14 earnings. ABCO currently trades at 2.3x revenues and 20x earnings.

In FY:13, Royall grew revenues by 13% and then by 18% in FY:14. From FY:11 to FY:14 Royall revenues grew by a [compound annual growth rate ("CAGR")] of 14.5%, which is in line with ABCO's historical growth rates. *However, in 2015, Royall only grew by 5%, to $118 million, below management's expectations of $125-130 million, due to a rocky integration, with the top two executives (CEO & CFO) from Royall resigning. We believe it will take some time for revenue growth rates to ramp back up and normalize*.

In the years 2010 to 2014, ABCO made many smaller to medium-size acquisitions in order to build out the business. In these years, cash purchases for acquisitions averaged 1.05x adjusted net income. However, this was not a drain on cash as cash flows from operations well outpaced net income due to the large amount of deferred revenues received each year. Until the Royall purchase, ABCO had not had to issue any new debt or common stock to fund acquisitions.

Unlike prior acquisitions, ABCO issued $575 million in new debt and almost $150 million in new common stock to finance the Purchase of Royall. The interest expense for 2015 was around $20 million and the stock issuance led to share dilution of around 10%. *Goodwill grew by $664 million from $187 million to $851 million with the purchase, meaning that over 78% of the purchase of Royall was allocated to goodwill on the balance sheet. In 4Q:15, ABCO had to write down $95 million of this Goodwill for impairment, leading to reported GAAP EPS of -$2.43*. Goodwill is now 37% of assets and 164% of total equity.

62.    Michael Boyd, writing on Seeking Alpha on August 26, 2016, wrote, in pertinent part, as follows:

**Poorly Executed Acquisition, Resulting Impairment Charge**

In what amounts to a rather *stunning apparent misstep*, Advisory Board ended up booking a $99M impairment charge related to its acquisition of Royall, a higher education data solutions provider. This transaction closed early January of 2015 and failed its first goodwill impairment test in October of the same year. *It is highly unusual, even in transactions rich in booked goodwill, for a company to misstep so poorly in projecting first year cash flows to necessitate a failed impairment test year one*.

Advisory Board does not break out Royall results separately, but the company did reveal some specifics during the Q4 2015 call (alongside the impairment charge). *The fact that Royall only generated $118M in revenue is painful enough; paying 7x revenue on any business is steep. That is beside the fact that the business is*

- 21 -

*only growing mid-single digits*. While Advisory Board has not provided any granular detail, back-of-the-envelope calculations put adjusted EBITDA of Royall at $45M at the time of acquisition (pro-forma fiscal 2014 was $143M, reported EBITDA of $97M in same time frame for Advisory Board). Purchase price was therefore in the neighborhood of 18x EV/EBITDA.

*At the time of the acquisition announcement, Advisory Board management was trumpeting Royall's 15% CAGR in revenue/EBITDA since 2012. How (and why) did the business contract to 5% growth nearly overnight in 2015? This isn't a one-time annual miss; management expects more single-digit growth from the business in 2016. The lack of a real answer here from management is about as big of a red flag as you can get*.

63.    In response to the news disclosed on February 23, 2016, the price of Advisory Board common stock plummeted approximately 27%, from $36.29 per share on February 23, 2016, to close at $26.50 per share the next day, on extremely high volume of 8.4 million shares.

## POST-CLASS PERIOD DEVELOPMENTS

64.    On March 11, 2016, Advisory Board filed its annual report for the fiscal year ended December 31, 2015, on Form 10-K. Concerning the Company's goodwill impairment charge for Royall, the Form 10-K stated, in pertinent part, as follows:

*In connection with our annual goodwill assessment on October 1, 2015, management reduced its cash flow projections for Royall due in part to first year performance being below the expectations we had set as of the acquisition date*. Based on the results of the impairment test, we recorded an impairment charge of 15.3% of Royall's goodwill. For information about this $99.1 million impairment charge, see Note 8, "Goodwill and intangibles," to our consolidated financial statements included in this report.

*          *          *

The Royall reporting unit had goodwill of $648.3 million as of October 1, 2015. The estimated fair value of the reporting unit did not exceed its carrying value and, therefore, step two of the goodwill impairment was performed. *The decrease in fair value of the reporting unit from the acquisition was due to reduced projected cash flow growth rates due in part to lower than expected first year performance and lower market derived multiples between the January 9, 2015 acquisition date and the October 1, 2015 goodwill impairment assessment date*. As the Company completed its calendar year 2016 forecast in the three months ended December 31, 2015, it revised its outlook for the Royall business, reducing cash flow forecasts over the projection period. The projections incorporated the effect of current market

conditions, including revenue growth, customer attrition, operating margins, capital expenditures, and working capital dynamics. The market-based WACC used in the income approach for Royall was 11%. The terminal growth rate used in the discounted cash flow model was 3.5%.

As the Royall reporting unit failed the step one test, the Company performed the step two test. In connection with the step two test, the Company estimated the fair value of identifiable intangible assets and deferred revenue using methodologies consistent with those used in the original Royall purchase price allocation. Key assumptions were updated to reflect the current outlook for the Royall business as well as market conditions. The result of the step two analysis resulted in a goodwill impairment of $99.1 million.

## ADDITIONAL SCIENTER ALLEGATIONS

65.    As alleged herein, Advisory Board and the Individual Defendants acted with scienter in that they knew that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Advisory Board, their control over, and/or receipt and/or modification of Advisory Board's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Advisory Board, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

66.    During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Advisory Board common stock and operated as a fraud or deceit on purchasers of Advisory Board common stock during the Class Period by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and

fraudulent conduct became apparent to the market, the price of Advisory Board common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Advisory Board common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

67. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

68. Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine, because the market for Advisory Board's publicly traded securities was open, well-developed and efficient at all times during the Class Period. As a result of the materially false and misleading statements alleged herein, Advisory Board common stock traded at artificially inflated prices during the Class Period. Further, Plaintiff and other members of the Class purchased Advisory Board common stock in reliance on the integrity of the market price of the common stock and the market information relating to Advisory Board, and were damaged thereby.

69.     At all relevant times, the market for Advisory Board common stock was an efficient market for the following reasons, among others:

(a)     Advisory Board common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Advisory Board filed periodic public reports with the SEC and the NASDAQ;

(c)     Advisory Board regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Advisory Board was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for Advisory Board common stock promptly digested current information regarding Advisory Board from all publicly available sources and reflected such information in the price of the common stock.   Under these circumstances, all purchasers of Advisory Board common stock during the Class Period suffered similar injury through their purchase of Advisory Board common stock at artificially inflated prices and a presumption of reliance applies.

71.     Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose.  Specifically, Plaintiff is

entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's operations, forecasts, and business prospects.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

72.    Plaintiff incorporates ¶¶1-71 by reference.

73.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Plaintiff and the Class; and (b) artificially inflate the price of Advisory Board common stock.

74.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Advisory Board common stock during the Class Period.

75.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Advisory Board common stock. Plaintiff and the Class would not have purchased Advisory Board common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

76.    Plaintiff incorporates ¶¶1-75 by reference.

77.    The Individual Defendants acted as controlling persons of Advisory Board within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Advisory Board common stock, the Individual Defendants had the power and authority to cause Advisory Board to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 3, 2017              ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     ALAN I. ELLMAN
                                     ROBERT D. GERSON

                                         */s/ Samuel H. Rudman*
                                           SAMUEL H. RUDMAN

                                     58 S. Service Road, Suite 200
                                     Melville, NY 11747
                                     Telephone: 631/367-7100
                                     631/367-1173 (fax)
                                     srudman@rgrdlaw.com
                                     aellman@rgrdlaw.com
                                     rgerson@rgrdlaw.com

                                     VANOVERBEKE MICHAUD & TIMMONY, P.C.
                                     THOMAS C. MICHAUD
                                     79 Alfred Street
                                     Detroit, MI 48201
                                     Telephone: 313/578-1200
                                     313/578-1201 (fax)

                                     *Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Monroe County Employees' Ret. Sys. v. The Southern Co., et al.*, No. 1:17-cv-00241 (N.D. Ga.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

ADVISORY BOARD

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of August, 2017.

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _Chairman_____

- 2 -

ADVISORY BOARD

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 02/26/2015 | 2,655 | $54.75 |